**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
STEVEN DEMEO,                                   :

                         Plaintiff,      :

          v.                          :

ST. JOHN'S UNIVERSITY and MIKE          :
ANDERSON, in his individual and professional   :
capacities,                                              :

                  Defendants.    :
-----------------------------------------------------------X

|  |  |
|---|---|
| : | Index No. |
| : | **COMPLAINT** |
| : | **Jury Trial Demanded** |

Plaintiff Steven DeMeo ("Plaintiff") alleges, against Defendants St. John's University

("St. John's") and Mike Anderson (together, the "Defendants") as follows:

## PRELIMINARY STATEMENT

1.      St. John's University's Head Basketball Coach, Defendant Mike Anderson, fired

Mr. DeMeo directly after Mr. DeMeo disclosed an ongoing serious heart condition that required

accommodations due to the pandemic.  Mr. Anderson had *never* before indicated to Mr. DeMeo

that there were any problems with his performance, coaching or recruiting – to the contrary, Mr.

Anderson had only praised Mr. DeMeo for his hard work in contributing to the team's success

and to Mr. Anderson being awarded the 2020-21 Big East Coach of the Year.

2.      However, Mr. Anderson – knowing that Mr. DeMeo worked tirelessly during the

pandemic and despite being immunocompromised due to a heart condition and multiple related

surgeries in 2020 – abruptly and callously fired Mr. DeMeo after Mr. DeMeo informed Mr.

Anderson that additional medical procedures were forthcoming, and he would likely need

additional medical leave.

3.      Furthermore, Mr. Anderson terminated Mr. DeMeo in June 2021, long after the well-recognized period for making coaching personnel changes in college basketball (in March, before the April-May signing period), further damaging Mr. DeMeo's ability to find a new job for the upcoming college basketball season.  In short, when Mr. DeMeo needed to rely on Mr. Anderson more than ever due to his medical condition – he simply cut Mr. DeMeo loose.

4.      Defendants' conduct constitutes blatant violations of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"), the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq*. ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*. ("NYCHRL"), and the New York Labor Law ("NYLL"), for which Mr. DeMeo seeks all available relief, including punitive damages.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

6.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2) because St. John's is located in New York and because a substantial part of the events or omissions giving rise to this action occurred there.  St. John's is located in this District, and Plaintiff's employment and performance occurred in this District.

## ADMINISTRATIVE PREREQUISITES

7.      Plaintiff will file a complaint with the Equal Employment Opportunity Commission ("EEOC") and he will file an Amended Complaint alleging violations of the

Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et. seq.* ("ADA") following the EEOC's issuance of a Notice of Right to Sue.

8.      Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

9.      Thus, any and all other prerequisites to the filing of this suit have been met.

## PARTIES

10.     Plaintiff Steven DeMeo is a former Assistant Coach of Men's Basketball at St. John's.   DeMeo is a resident of the State of New York.  At all relevant times, Mr. DeMeo was an "employee" under all relevant statutes.

11.     Defendant St. John's is a four-year school of higher education with its headquarters located at 8000 Utopia Parkway, Queens, New York 11439.  At all relevant times, St. John's was an "employer" within the meaning of all applicable statutes.

12.     Defendant Mike Anderson is a resident of the State of New York and the Head Coach of the St. John's men's basketball team.  At all relevant times, Mr. Anderson was an "employer" under all relevant statutes and exercised the authority to control Mr. DeMeo's employment, including his work assignments, pay and responsibilities.

## FACTUAL ALLEGATIONS

## I.      BACKGROUND

13.     Born and raised in Queens, New York, Mr. DeMeo began his career in college basketball more than 30 years ago.

14.     Throughout his career, Mr. DeMeo has worked tirelessly to create successful and winning environments everywhere that he has coached.  He has a track record for recruiting high level student athletes and for finding "diamond in the rough" recruits, has guided student athletes to careers in the NBA and other professional leagues and has accomplished outstanding graduation rates for his student athletes.

15.     Mr. DeMeo has coached at all levels of college basketball from Junior College to Division I.  Mr. DeMeo's wealth of experience includes tenures as the Head Coach at Monroe Junior College (1993-1995), Assistant Coach at Division I Iona College (1995-1998), Assistant and Associate Head Coach at Division I Providence College (1998-2008), Assistant Coach at Division I University of Central Florida (2008-2009), Head Coach at Division II Newberry College (2009-2010), Associate Head Coach at Division I Hofstra University (2010-2013) and Head Coach at Northwest Florida State College ("NWFS") (2014-2019).

16.     Wherever Mr. DeMeo coached, his programs experienced tremendous success. At Iona College, the team reached the post-season each of his three years as an Assistant Coach, including earning a coveted National Collegiate Athletic Association ("NCAA") tournament berth during the 1997-1998 season.

17.     Similarly, Providence College made five postseason appearances during his tenure, including twice qualifying for the NCAA tournament.

18.     During Mr. DeMeo's tenure, Hofstra reached a school record 14 conference wins and was invited to the NCAA Men's College Basketball Invitational.

19.     Most recently, prior to joining St. John's, Mr. DeMeo spent six seasons as the Head Coach at NWFS where he built the program into a national Junior College powerhouse.  In 2015, Mr. DeMeo led NWFS to its first National Junior Collegiate Athletic Association

("NJCAA") Division I Men's Basketball National Championship in 20 years.  His teams

qualified for the NJCAA Men's Basketball National Tournament each subsequent year,

compiling a 170-27 record (.862 win percentage) over his six-year tenure.

20.     In 2018, as a result of his outstanding coaching at NWFS, Mr. DeMeo was named

the No. 1 ranked Junior College coach (out of over 300) in America by "Basketball Times"

magazine, which is based on consultations with two and four-year coaches across the country.

21.     Mr. DeMeo has been able to achieve his on-court success in-part due to his

acumen for talent evaluation and his ability to consistently recruit high-end talent to the various

programs for which he coached.

22.     By way of example only, Mr. DeMeo coached and/or recruited six future National

Basketball Association ("NBA") players during his career, including MarShon Brooks and Ryan

Gomes, who were both first round draft picks that enjoyed long NBA careers.  A seventh – Chris

Duarte, who Mr. DeMeo recruited and coached at NWFS – later successfully transferred to the

University of Oregon and was a first-round pick (13th overall) in the 2021 NBA draft.  Dozens

of Mr. DeMeo's other players have played professionally, in both domestic leagues and

internationally.

23.      Mr. DeMeo has also helped many of his Junior College players successfully

advance to Division I programs.

24.     After Mr. Anderson was hired by St. John's on April 19, 2019 (after St. John's

previous coach, NBA Hall of Famer Chris Mullin, abruptly resigned), he knew that he needed an

assistant coach to help him guide St. John's to national prominence.  Moreover, because Mr.

Mullin had resigned unusually late in the college basketball year (universities customarily fill

coaching vacancies in March, directly after the season concludes), Mr. Anderson knew that he needed to hire a coach who could "hit the ground running" and help immediately.

25.     Given Mr. DeMeo's background, track record and reputation – as a recruiter, as a coach and as a person – he was one of Mr. Anderson's first calls to fill a vacancy on his staff for an Assistant Coach.  Shortly after first meeting Mr. DeMeo, Mr. Anderson extended him an offer to begin working as an Assistant Coach.  Mr. DeMeo started at St. John's on May 28, 2019.

26.     For Mr. DeMeo, the opportunity to work at St. John's – the premier Division I program in his home state of New York – was a dream come true.

## II.     **MR. DEMEO'S EARLY TENURE AT ST. JOHN'S**

27.     Immediately after he started, Mr. DeMeo started "pounding the pavement" and looking for ways to improve the team and get to know the players.

28.     Mr. DeMeo spent countless hours poring over game film, reading about and studying potential prospects and attending games and practices all over the world, including in Eastern Europe, to meet potential prospects.

29.     Because of the timing of his hire, Mr. DeMeo was handcuffed in his ability to recruit for the upcoming 2019-20 college basketball season, given that Division I college basketball has two signing periods for incoming students in a given year ("early signing period" in November of the previous year, followed by mid-April to mid-May of the following year).

30.     Moreover, St. John's overall recruitment of players for the 2020-2021 season was negatively impacted by the abnormal, off-cycle timing of Mr. Mullin's departure.  Competitive Division I programs focus on recruiting new players from the moment their seasons end in early March (*i.e.* in advance of the second signing period starting in April).  Because Mullin did not

resign until April 2019, St. John's coaches lost valuable time in making connections with potential student athletes and were behind their major Division I competitors.

31.     These recruiting disadvantages were especially acute for Mr. DeMeo, who had started approximately a full month after T.J. Cleveland (Associate Head Coach) and Van Macon (the other Assistant Head Coach).

32.     Nonetheless, Mr. DeMeo did everything possible to help St. John's right from the start.  Mr. DeMeo made internationals scouting trips to Greece and Romania and traveled across the country to attend workouts with domestic players.  Mr. DeMeo was forced to juggle these scouting trips with moving from Florida to New York and integrating himself into a new program as a brand-new coach.

33.     Despite these many challenges, Mr. DeMeo's recruiting efforts bore immediate fruit.  Specifically, Mr. DeMeo led the efforts to secure a September 2019 verbal commitment from Isaih Moore.  The *New York Post* described Mr. Morre as a "highly regarded junior [] forward,[1]" who also had offers from elite Division I programs such as the University of Alabama, University of Arkansas, Louisiana State University, Mississippi State University and the University of Tulsa.  Mr. DeMeo was congratulated internally by Mr. Anderson and the other staff for landing this recruit.

34.     Also in September 2019, Mr. DeMeo was instrumental in recruiting Vince Cole, a Junior College All-American shooting guard, who was being recruited by several top Division I programs, including North Carolina State University, Oregon State University and Coastal Carolina University.  One of Mr. DeMeo's assistant coaches at NWFS was Mr. Cole's Head

---

[1]     See https://nypost.com/2019/09/29/st-johns-lands-isaih-moore-to-continue-huge-recruiting-spree/ (last accessed June 30, 2021).

Coach at University of South Carolina-Salkehatchie and this connection proved indispensable in landing Mr. Cole's commitment.  The *New York Post* reported on Mr. Cole's commitment, stating that he gave "the new St. John's coach a promising future backcourt."[2]

35.     In just his first few months, Mr. DeMeo also identified numerous other domestic and international prospects that he believed were a good fit for Mr. Anderson's up-tempo system. However, Mr. Anderson and Mr. Cleveland ultimately decided to pass on these recruits and recommended that Mr. DeMeo not pursue them.  Many of these proposed recruits went on to play at large and respected Division I programs.

36.     In addition to recruiting, Mr. DeMeo worked tirelessly at practices to help players prepare for upcoming games and advance their skills.  Mr. DeMeo also prepared for upcoming games by reviewing game tape and scouting opponents.  Mr. DeMeo did anything and everything he could do to not only help the team but also help the players mature on and off the court.   This was all consistent with Mr. DeMeo's career track record and reputation.

37.     Due in large part to Mr. DeMeo's efforts together with the rest of the coaching staff, St. John's had a solid 2019-20 season as Mr. Anderson's first year as Head Coach.  The 2019-2020 season ended prematurely due to the COVID-19 pandemic in March 2020, but the future for the once-hallowed St. John's program looked bright.  Mr. DeMeo received nothing but positive feedback from Mr. Anderson.

---

[2]     See https://nypost.com/2019/09/22/st-johns-lands-commitment-of-juco-all-american-vince-cole/ (last accessed June 30, 2021).

### III.     MR. DEMEO REQUIRES HEART SURGERY AND IS HIGHLY SUSCEPTIBLE TO EXTREME RISKS FROM POTENTIAL COVID-19 EXPOSURE

38.     After the 2019-2020 college basketball season was shut down in March 2020, Mr. DeMeo returned his focus to recruiting.  But given the issues brought on by the COVID-19 pandemic, the entire nature of recruiting in college basketball changed in numerous ways.

39.     In-person recruiting trips were shut down entirely.  Instead, recruiting was done remotely, which included speaking to players over Zoom, telephone and text and reviewing video footage of potential targets.  Despite these limitations, Mr. DeMeo worked tirelessly to identify possible recruiting targets.

40.     However, in July 2020, Mr. DeMeo's career – and life – changed when he visited his doctor for his annual physical.  During his physical, his doctor detected an irregular heartbeat from a heart condition that Mr. DeMeo had previously been diagnosed with called Mitral Valve Prolapse ("MVP").

41.     MVP is a disease in which one of the valves in the heart does not close properly, potentially causing blood to leak backwards, back into his heart.  Mr. DeMeo had discovered that he suffered from MVP approximately 20 years earlier, but his case was generally mild and did not generally require any treatment beyond regular monitoring.

42.     Once Mr. DeMeo's doctor discovered that his MVP was causing an irregular heartbeat, he was referred to a cardiologist who recommended that he undergo an immediate heart surgery.  According to his cardiologist, delaying the procedure could risk long term damage to Mr. DeMeo's heart and health.

43.      Mr. DeMeo followed his cardiologist's advice and scheduled the surgery for late August 2020.  He immediately notified St. John's about the surgery and said he would need to take a medical leave of absence for both the surgery itself and his recovery afterwards.

44.     During the medical examinations leading up to the surgery, Mr. DeMeo's doctors uncovered other issues that exacerbated his health conditions.  By way of example only, Mr. DeMeo's doctors found a polyp (or mass) on his left vocal cord that needed to be surgically removed.  Thus, in addition to the gravity of the heart surgery, Mr. DeMeo also had additional procedures conducted at or around the same time.

45.     While these surgeries were successful, recovery was lengthy and significant.  By way of example only, Mr. DeMeo lost 20 pounds, his vision became acutely sensitive to light, he was often lightheaded, he had difficulties sleeping, suffered from back pain and had frequent bouts of exhaustion.  Mr. DeMeo's larynx paralyzed his left vocal cord and he had substantial difficulties speaking for weeks.

46.     Mr. DeMeo was recovering in the hospital for almost two weeks until he was eventually discharged and permitted to return home.  Notwithstanding his tenuous physical condition and his doctors' insistence that he focus on his recovery, Mr. DeMeo demonstrated his devotion to St. John's by continuing to perform his job as well as he was able.

47.     During the two weeks he was in the hospital recovering, Mr. DeMeo continued to keep his recruiting efforts going, sending texts and e-mails (speaking was extremely difficult at that time) and watching game film.  Mr. DeMeo was literally engaging in recruiting from a hospital bed when he was virtually unable to speak and in near constant pain.

48.     Mr. DeMeo returned home in mid-September 2020.  While home, Mr. DeMeo spent numerous hours per day – during which time he was supposed to be resting and recovering – preparing for the upcoming season and recruiting additional players.

49.     In fact, it was during this time period that Mr. DeMeo identified a high school center who he believed would be a perfect fit at St. John's.  O'mar Stanley was a 3-star recruit

and a Top 50 ranked center nationally according to the recruiting website 247Sports.com for the 2021-22 basketball season. Importantly, Mr. Anderson had long desired an elite center for his team to play inside and defend the basket.

50.     However, when Mr. DeMeo first raised Mr. Stanley as a possible recruit, he was rejected because Mr. Anderson and Mr. Cleveland did not believe Mr. Stanley was good enough to play Division I basketball. Mr. DeMeo was undeterred and believed that Mr. Stanley was being dismissed too quickly. Mr. DeMeo continued to push Mr. Anderson and Mr. Cleveland to watch additional game tape of Mr. Stanley, firmly believing he could be a great addition.

51.     Mr. DeMeo's persistence paid off. After watching Mr. Stanley's game tape, Mr. Cleveland agreed, texting Mr. DeMeo: "**You were right about O'Mar, he can go.**" As a result of DeMeo's insistence, St. John's began heavily recruiting Mr. Stanley, eventually securing his commitment.

## IV.     MR. ANDERSON'S PUBLIC SUCCESS IN THE 2020-21 SEASON

52.     In or around October 2020, Mr. DeMeo returned to work full time at the St. John's campus. However, as Mr. DeMeo informed Mr. Anderson, his underlying heart condition and recent surgeries had left him severely immunocompromised and especially susceptible to heightened risks should he contract COVID-19.

53.     Mr. DeMeo nevertheless insisted on returning to campus and being in-person with the coaching staff and players. Put simply, Mr. DeMeo's commitment to coaching and contributing to the basketball program was his top priority.

54.     As part of the COVID-19 protocols in place, all staff and players were required to wear masks at all times and socially distance during practices. The country was still amidst a

pandemic (vaccines would not be available for many months) that had shut down the previous season and could shut down the 2021-2022 season at any moment.

55.     However, Mr. Anderson was lax in enforcing these rules, and players and coaches routinely took their masks off during practice.   Moreover, social distancing was supposed to be in place whenever feasible, and Mr. Anderson and his staff also routinely disregarded these rules as well.

56.     This put DeMeo in an almost impossible position.  He wanted to work in-person with the team, but his pre-existing health condition meant that if he contracted COVID-19 the consequences could potentially be life threatening.  And safety protocols were not being employed or enforced in any meaningful manner.

57.     Mr. DeMeo balanced these competing interests to the best of his ability.  Mr. DeMeo continued to actively participate in practices and games, but was also far more vigilant that the other staff members and players with respect to safety precautions.  His life was at risk.

58.     Mr. DeMeo's immunocompromised state meant various modifications and accommodations relative to others.  By way of example, whereas the other coaches took basketball players out for coffee and/or meals, Mr. DeMeo could not be in close contact with individuals who were unmasked while they were eating meals.

59.     Similarly, Mr. DeMeo was unable to host basketball players in his small office (where social distancing was virtually impossible) to watch game film and talk about both basketball and non-basketball related topics.

60.     However, despite his safety precautions, Mr. DeMeo continued to work 60+ hour weeks, doing everything from coaching to recruiting.

61.     As a result of the contributions of Mr. DeMeo and the rest of the coaching staff, St. John's finished the 2020-21 season with a 16-11 record, and had its first winning record in Big East conference play in six years.  St. John's on-court success earned the basketball team an invitation to the National Invitational Tournament ("NIT").

62.     The Big East Conference recognized St. John's success in the 2020-2021 season when it awarded Mr. Anderson Big East Coach of the Year honors on March 10, 2021.  Mr. Anderson, in turn, received a six-year contract extension from St. John's.  Upon information and belief, Mr. Anderson's contract has an aggregate value of more than $20 million.

63.     After being awarded Coach of the Year honors, Mr. Anderson met with all his coaches, including Mr. DeMeo, and let them know that he understood that he could not have won the award without all of their contributions.  Mr. Anderson further told them that he was proud of all their work over the previous two years and looked forward to continuing to grow the basketball program with them in the future.

## V.     IN REALITY, MR. ANDERSON LOSES CONTROL OF THE TEAM IN 2020-21

64.     The public success of the St. John's men's basketball team on the court masked a tumultuous end to the season where Mr. Anderson lost control of the team and the players nearly revolted against him before the end of the season.  Mr. DeMeo helped hold the team together.

65.     On March 6, 2021, St. John's played its final game of the regular season against Seton Hall University.  During the first half of the game, Mr. Anderson instigated an argument with Isaih Moore over Mr. Moore's shot selection.  Mr. Anderson lost his temper and told his coaches at halftime that he was kicking Mr. Moore off the team from the locker room.

66.      Mr. DeMeo and other coaches believed that Mr. Anderson was overreacting in the heat of competition and that Mr. Moore did not deserve to be kicked off the team.  They also

felt that kicking a player off the team in the middle of a game was ill-advised.  Mr.  Anderson ignored their advice and proceeded to announce his decision to kick Mr. Moore off the team to his teammates.

67.     What happened next could only be described as a mutiny.

68.     In reaction to Mr. Anderson's announcement, the rest of the players banded together and said they would not go out onto the court and play the second half of the game to protest of Mr. Anderson's unjust treatment of Mr. Moore.

69.     Mr. DeMeo privately urged Mr. Anderson to show some restraint.

70.     Under extreme pressure, Mr. Anderson relented and walked back his decision to kick Mr. Moore off the team, to ensure that he had a team to put on the floor in the second half of the game.  However, Mr. Moore did not see any minutes on the floor in the second half.

71.     Unfortunately, this did not put an end to the internal turmoil.  In the days that followed the game, Mr. Anderson was still furious with Mr. Moore.  Further, he was angry at the rest of the team for siding with Mr. Moore over their coach and was committed to following through on his earlier threat to kick Mr. Moore off the team.

72.     As such, on March 8, 2021, Mr. Anderson announced that he had again decided to kick Mr. Moore off the team.  The remaining players on the team *again* revolted, refusing to even practice if Mr. Anderson followed through on his threat.  Once again, Mr. Anderson was forced to back down and Mr. Moore was not kicked off the team.

73.     These incidents show that Mr. DeMeo was a positive contributor to the team and provided good guidance to Mr. Anderson during situations involving difficult team dynamics. As shown, Mr. Anderson followed Mr. DeMeo's private guidance.

74.     One week later, after receiving the NIT invitation, St. John's announced that it would not be participating in the NIT.  Publicly, St. John's justified its decision by pointing to the "mental and physical demands . . . due to extensive COVID-19 protocols."[3]

75.     In truth, having refused to play for Mr. Anderson twice in three days due to what it believed was his vindictive and unfair treatment of Mr. Moore, the team simply did not want to play for him anymore.

76.     St. John's stated reliance on COVID-19 was merely a false excuse to protect Mr. Anderson and ensure that the public was not made aware that the supposed "Coach of the Year" had completely lost the respect of his team.

77.     In fact, seven members of the team decided to transfer after the 2020-21 season, an unprecedented number for an otherwise successful Division I college basketball team.

## VI.     MR. ANDERSON FIRES MR. DEMEO AFTER HE DISCLOSES ONGOING MEDICAL ISSUES AND THE NEED FOR ONGOING ACCOMODATIONS

78.     Following the 2020-21 season, in May 2021, Mr. DeMeo met with Mr. Anderson to discuss Mr. DeMeo's performance review.  Mr. Anderson had always praised Mr. DeMeo's work ethic and results and following the successful 2020-21 season, the performance review meeting was expected to be a non-event.

79.     During the review, among other topics, Mr. Anderson and Mr. DeMeo discussed Mr. DeMeo's recruiting efforts.  Significantly, in March 2021, after the mass exodus of St. John's players entering the transfer portal, Mr. DeMeo had landed another significant recruit –

---

[3]     See https://nypost.com/2021/03/14/st-johns-seton-hall-decline-nit-to-officially-end-seasons/ (last accessed June 30, 2021).

Stef Smith, a transfer from the University of Vermont ("UVM") who the New York Post identified as filling a "huge need"[4] for the University.

80.     Mr. Smith was a three-year starting guard for UVM, averaging 13.6 points on 45.6% shooting and 36% on three-pointers.  In 2020-21, Mr. Smith was named Second Team All-Conference.  Due to Mr. DeMeo's pursuit, Mr. Smith chose St. John's over several other competing schools.

81.     Mr. Anderson told Mr. DeMeo to keep up his work in recruiting and to continue to developing relationships with the players on the team.  However, this was fairly non-descript and general feedback.  At this time, Mr. DeMeo felt it was the appropriate time to openly discuss his experiences working during the pandemic and post-surgery, his ongoing medical condition and his need to continue being vigilant about safety and health with the ongoing pandemic.

82.     Mr. DeMeo told Mr. Anderson about the difficulties that he had faced over the previous year due to his heart surgery and other procedures, his need to be hyper-vigilant about health and additional procedures he still had upcoming the following weeks.

83.     Mr. DeMeo said he would likely need some additional time off for an upcoming medical procedure.  Upon hearing these remarks, Mr. Anderson rolled his eyes and said: "**Well, you have a job to do, you have to do it**."

84.     Mr. DeMeo replied that he would of course do his job – as he always had – but that he needed Mr. Anderson to be understanding of his medical conditions.  Mr. Anderson responded again: "**You have a job to do, you have to do it**."  Mr. Anderson then ended the meeting.

---

[4]     See https://nypost.com/2021/03/26/st-johns-fills-huge-need-with-stef-smith-transfer/ (last accessed June 30, 2021).

85.     Clearly, Mr. Anderson did not want to hear anything more about Mr. DeMeo's medical conditions or his accommodation needs.  To be clear, Mr. Anderson had never once before ever stated – verbally or in writing – that Mr. DeMeo had not performed his job.  To the contrary, Mr. Anderson had always told Mr. DeMeo that he was a great contributor.

86.     Thereafter, on or about May 19, 2021, Mr. Macon was promoted to the Associate Head Coach position (he had been an Assistant Coach).  Thus, Mr. Macon and Mr. Cleveland were both Associate Head Coaches, leaving Mr. DeMeo as the only Assistant Coach on Mr. Anderson's staff.

87.     On June 8, 2021, Mr. Anderson abruptly informed Mr. DeMeo that he was being terminated.  Mr. Anderson knew very well that Mr. DeMeo had worked tirelessly through the pandemic and even put himself in potential physical harm by coaching during the 2020-21 season.  Moreover, Mr. Anderson was well aware that Mr. DeMeo had ongoing medical procedures requiring attention and accommodation.  Mr. Anderson simply did not want to "deal with" Mr. DeMeo's medical conditions and related accommodations.

88.     As stated, Mr. DeMeo was a stellar Assistant Coach and any attempt to claim that his termination was somehow performance-based would be easily proven false.

89.     First, as explained above, it is well known that college basketball programs make coaching personnel decisions in March, immediately after the previous season ends.  This allows for the coach to find an alternate position in advance of the critical April-May signing period and allows for the school to find a replacement before that signing period as well.

90.     In this case, if St. John's had any intention to terminate Mr. DeMeo's employment for performance reasons or otherwise, that decision would have been made no later than March

17

2021.  Not only did that not happen, but there was no mention of any performance issues or any plans to let Mr. DeMeo go.

91.     It was only after Mr. DeMeo discussed his ongoing medical condition with Mr. Anderson and his need for additional medical procedures going forward that Mr. Anderson chose to terminate employment.  By waiting until June, Mr. Anderson minimized Mr. DeMeo's opportunities to find suitable alternate employment for the 2021-22 season.

92.     Although Mr. DeMeo's performance at St. John's was beyond reproach, it bears noting that Mr. DeMeo had great relationships with St. John's players.  In fact, part of what made Mr. DeMeo such a successful coach, and an attractive hire for St. John's in the first place, was his ability to develop relationships with the players on his team.  If the players had an issue with anyone on the coaching staff it was with Mr. Anderson himself, as described above.

93.     Similarly, Mr. DeMeo's recruiting efforts were also beyond reproach.  Mr. DeMeo had always been a successful recruiter, attracting professional talent to programs as diverse as Providence College and NWSF.  His success continued at St. John's where he was instrumental in recruiting several important players, including, *inter alia*, Isaih Moore, Vince Cole, O'mar Stanley and Stef Smith.

94.     In addition, Mr. DeMeo had identified several blue-chip recruits that Mr. Anderson and his staff rejected.  By way of example only, Mr. DeMeo identified the following players that he believed St. John's should pursue:

- **Keon Ellis** – a Junior College transfer from Florida Southwestern State College.  Mr. Anderson and his staff rejected Mr. Ellis because he did not believe Mr. Ellis was a good enough shooter to play for St. John's.  Mr. Ellis ended up going to The University of Alabama, where he led the team in field goal percentage and was second in 3-point field goal percentage among rotation players for a

team that finished first in its conference and was a 2 seed in the NCAA tournament.

- **Mustapha Amzil** – a 6-foot-10, 215 pound forward who Mr. DeMeo discovered during an international scouting trip in Finland. Mr. Anderson and his staff rejected Mr. Amzil because he thought Mr. Amzil was not good enough to play college basketball. Mr. Amzil ended up going to the University of Dayton, where he started as a freshman and was second in field goal percentage, 3-point field goal percentage, rebounds and blocks among starters.

- **Rivaldo Soares** – a Junior College 1st team All-American guard. Mr. Anderson and his staff rejected Mr. Soares because he thought Mr. Soares was not good enough to play at St. John's. Mr. Soares received offers from elite Division I programs such as Florida State University and Oklahoma State University before ultimately agreeing to attend the University of Oregon, which is coming off of a season in which it went 21-7 and won its conference.

- **Alston Mason** – a 3-star high school recruit. Mr. Anderson and his staff rejected him because he thought Mr. Mason was too "small" to play college basketball. Mr. Mason was recruited by Clemson University, Colorado State University and Kansas State University before committing to Oklahoma University, one of the perennial top basketball programs in the country, and which earned a place in the 2021 NCAA tournament.

- **Kerio Oquendo** – a Junior College transfer from Florida Southwestern State College where he was First Team All-Conference in the 2020-2021 season. Mr. Anderson and his staff rejected Mr. Oquendo because he did not believe Mr. Oquendo was good enough to play point guard for St. John's. Oquendo was recruited by Oregon University and Marquette University before committing to play for the University of Georgia.

95.     Mr. DeMeo had identified all these players as realistic recruiting targets who could contribute to making St. John's a top-tier Division I program. That they were all recruited by, and in some cases succeeded at, elite Division I schools only supported Mr. DeMeo's

evaluations.  Notably, Mr. DeMeo was able to get a commitment from *every single* player Mr. Anderson gave him the greenlight to pursue.

96.     Moreover, Mr. DeMeo's performance is all the more impressive under the circumstances.  For his first season at St. John's (the 2019-2020 season) he was hired off-cycle after the April-May signing period had closed.  Thereafter, following his second season (the 2020-21 season), the world shut down due to the pandemic. Mr. DeMeo, who was highly susceptible to heightened risks of COVID-19, had to undergo heart surgery and other procedures, and had to be extremely careful with safety protocols to protect his health.

97.     The FMLA, ADA, as well as the NYSHRL and NYCHRL, are intended to afford employees with medical conditions and disabilities a semblance of respect and dignity in the workplace.  Those laws take on even more importance during a global pandemic.  Mr. Anderson – simply because he is the Head Coach of a Division I basketball program getting paid millions of dollars per year – is not above the law or exempt from its requirements.

**VII.   ST. JOHN'S WITHHOLDS MR. DEMEO'S EARNED VACATION PAY AFTER HE RETAINS LEGAL COUNSEL**

98.     When St. John's terminated Mr. DeMeo's employment, the school provided him with a termination letter which stated amongst other things that, "You will be paid for all accrued but unused vacation days as of June 8th, which is your Separation Date."

99.     That was consistent with the terms of Mr. DeMeo's employment agreement with St. John's, which provided that part of his compensation was that he would be entitled to accrue 22 vacation days per year, at a rate of 1.83 vacation days per month.

100.    As reflected in the June 8, 2021 letter, it is St. John's policy and practice to pay employees for their accrued and unused vacation following termination, and St. John's has no policy or practice stating that accrued and unused vacation days are forfeited upon termination.

101.    Despite confirming that Mr. DeMeo would be paid for his accrued vacation days, St. John's never paid Mr. DeMeo for his accrued but unused vacation days after he retained counsel and his counsel raised claims of discrimination in written correspondence and advised St. John's of the potential for litigation.

102.    St. John's conduct in refusing to pay and withholding Mr. DeMeo's accrued and unused vacation pay after Mr. DeMeo raised claims of discrimination constitutes further discrimination and retaliation against him and also constitutes violations of the New York Labor Lawe.

**FIRST CAUSE OF ACTION**
**(Retaliation in Violation of the FMLA)**
***Against All Defendants***

103.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

104.    At all times relevant herein, Defendant St. John's was a "covered employer" within the meaning of the FMLA.  St. John's employs 50 or more employees in at least 20 calendar weeks within a 75-mile radius of the St. John's.

105.    Upon information and belief, at all times relevant herein, Plaintiff was either actually or potentially eligible as a "covered employee" within the meaning of the FMLA because he worked full-time for approximately 100 weeks at St. John's before he was unlawfully terminated by the Company.

106.    By the actions described above, among others, Defendants have retaliated against Plaintiff for utilizing rights available under the FMLA, informing Defendants that he intended to avail himself of rights under the FMLA and for raising complaints about Defendants' violations of the FMLA.

107.    As a direct and proximate result of Defendants unlawful retaliatory conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, emotional distress, mental anguish and reputational harm for which he is entitled to an award of monetary damages, liquidated damages, reasonable attorneys' fees and expenses and other relief.

## SECOND CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
### *Against All Defendants*

108.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

109.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of his disability and/or perceived disability in violation of the NYSHRL, and Mr. Anderson aided and abetted the unlawful conduct to which Plaintiff was subjected.

110.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, mental anguish, emotional distress and reputational harm for which he seeks all available relief.

111.    Defendants' unlawful actions constitute intentional, malicious, willful and wanton violations of the NYSHRL entitling Plaintiff to an award of punitive damages.

112.    Plaintiff also seeks recovery of all attorneys' fees and expenses.

## THIRD CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

113.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

114.    By the actions described above, among others, Defendants retaliated against Plaintiff for his engagement in protected activities in violation of the NYSHRL, including but not limited to, by terminating his employment and withholding his compensation.

115.    By the actions described above, Mr. Anderson aided and abetted the unlawful conduct to which Plaintiff was subjected.

116.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, mental anguish, emotional distress and reputational harm for which he seeks all available relief.

117.    Defendants' unlawful actions constitute intentional, malicious, willful and wanton violations of the NYSHRL entitling Plaintiff to an award of punitive damages.

118.    Plaintiff also seeks recovery of all attorneys' fees and expenses.

**FOURTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
***Against All Defendants***

119.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

120.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

121.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of his disability and/or perceived disability in violation of the NYSHRL, and Mr. Anderson aided and abetted the unlawful conduct to which Plaintiff was subjected.

122.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, mental anguish,

emotional distress and reputational harm for which he seeks all available relief.

123.    Defendants' unlawful actions constitute intentional, malicious, willful and wanton violations of the NYSHRL entitling Plaintiff to an award of punitive damages.

124.    Plaintiff also seeks recovery of all attorneys' fees and expenses.

### FIFTH CAUSE OF ACTION
**(Retaliation in Violation of the NYCHRL)**
***Against All Defendants***

125.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

126.    By the actions described above, among others, Defendants retaliated against Plaintiff for his engagement in protected activities in violation of the NYSHRL, including but not limited to, by terminating his employment and withholding his compensation.

127.    By the actions described above, Mr. Anderson aided and abetted the unlawful conduct to which Plaintiff was subjected.

128.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, mental anguish, emotional distress and reputational harm for which he seeks all available relief.

129.    Defendants' unlawful actions constitute intentional, malicious, willful and wanton violations of the NYSHRL entitling Plaintiff to an award of punitive damages.

130.    Plaintiff also seeks recovery of all attorneys' fees and expenses.

## SIXTH CAUSE OF ACTION
### (Failure to Pay Wages Under NYLL § 198-c)
### *Against Defendant St. Johns*

131.    Plaintiff repeats, reiterates and re-alleges each and every allegation in the

preceding paragraphs, as though fully set forth herein.

132.    NYLL § 198-c(1) provides that :

> any employer who is party to an agreement to pay or provide
> benefits or wage supplements to employees or to a third party or
> fund for the benefit of employees and who fails, neglects or refuses
> to pay the amount or amounts necessary to provide such benefits or
> furnish such supplements within thirty days after such payments
> are required to be made…

133.    NYLL § 198-c(2) provides that:

> As used in this section, the term "benefits or wage supplements"
> includes, but is not limited to, reimbursement for expenses; health,
> welfare and retirement benefits; and vacation, separation or
> holiday pay.

134.    Plaintiff and St. John's had an agreement that he would be entitled to vacation pay

as a component of his earned wages and that such wages would not be subject to forfeiture upon

termination.  St. John's has refused to pay Mr. DeMeo's accrued and unused vacation pay.

135.    More than 30 days has elapsed since Mr. DeMeo's termination and St. John's

continues to withhold and refuse to pay Mr. DeMeo's vacation compensation.

136.    Mr. DeMeo seeks all available relief including payment of all wages owed,

liquidated damages and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against

Defendants, through the following relief:

A.      A declaratory judgment that the actions of Defendants complained of herein violate the laws of the State of New York;

B.      An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

F.      An award of punitive damages in an amount to be determined at trial;

G.      An award of liquidated damages in an amount to be determined at trial;

H.      An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: September 23, 2021
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
David E. Gottlieb
Renan F. Varghese

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile:  (212) 257-6845
dgottlieb@wigdorlaw.com
rvarghese@wigdorlaw.com

*Counsel for Plaintiff*